# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES

v.

FRANCISCO BETANCOURT,
CARLOS ANTONIO HERNANDEZ, and
LUCILO CABRERA

No. 3:16-cr-238 (SRU)

## RULING ON MOTIONS FOR JUDGMENT OF ACQUITTAL AND/OR FOR A NEW TRIAL (Doc. Nos. 234, 235, 242, 257)

Francisco Betancourt, Carlos Hernandez, and Lucilo Cabrera were charged via a third superseding indictment with kidnapping, conspiracy to commit kidnapping, extortion, and conspiracy to commit extortion.[1] *See* Third Super. Indict., Doc. No. 115. After a nine-day trial, the jury returned its verdict on March 9, 2018. *See* Verdict, Doc. No. 225. Betancourt, Hernandez, and Cabrera were each found guilty of one count of conspiracy to commit kidnapping (Count One) and one count of conspiracy to commit extortion (Count Two). *Id.* In addition, Betancourt was convicted of three counts of kidnapping (Counts Three, Four, and Five), and three counts of extortion (Counts Six, Nine, and Eleven).[2] *Id.* Hernandez was convicted of three counts of kidnapping (Counts Three, Four, and Five), and two counts of extortion (Counts Six and Nine).[3] Cabrera was convicted of two counts of kidnapping (Counts

---

[1] Co-defendant Pascual Rodriguez was also charged in the third superseding indictment. *See* Third Super. Indict., Doc. No. 115. Rodriguez filed a Motion to Sever before trial, which I granted. *See* Order, Doc. No. 181. Accordingly, he was not tried alongside Betancourt, Hernandez, and Cabrera and later entered a guilty plea on October 12, 2018. *See* Findings and Recommendations, Doc. No. 278.

[2] Betancourt was acquitted of three counts of kidnapping (Counts Seven, Eight, and Ten). *See* Verdict, Doc. No. 225.

[3] Hernandez was acquitted of two counts of kidnapping (Counts Seven and Eight). *See* Verdict, Doc. No. 225.

Fifteen and Sixteen) and three counts of extortion (Counts Eleven, Fourteen, and Seventeen).[4]
*Id.*

Betancourt, Cabrera, and Hernandez all filed Motions for Judgment of Acquittal and/or New Trial on March 16, 2018, March 19, 2018, and March 21, 2018, respectively. Betancourt Mot. for J. Acquittal and/or New Trial ("Betancourt Mot."), Doc. No. 234; Cabrera Mot. for J. Acquittal and/or New Trial ("Cabrera Mot."), Doc. No. 235; Hernandez Mot. for J. Acquittal and/or New Trial ("Hernandez Mot."), Doc. No. 242. Thereafter, the defendants each filed memoranda of law in support of their motions. Cabrera Mem. in Supp. Mot. for J. Acquittal and/or New Trial ("Cabrera Mem. in Supp."), Doc. No. 256; Betancourt Mem. in Supp. Mot. for J. Acquittal and/or New Trial ("Betancourt Mem. in Supp."), Doc. No. 257; Hernandez Mem. in Supp. Mot. for J. Acquittal and/or New Trial ("Hernandez Mem. in Supp."), Doc. No. 258. The government filed its opposition on September 21, 2018, Gov't Opp., Doc. No. 273; and Cabrera thereafter filed a reply. Cabrera Reply, Doc. No. 285.

In their motions, the defendants argue that they are entitled to judgments of acquittal because the government: (1) failed to establish the "taking" element of kidnapping; (2) failed to establish the "holding" element of kidnapping; and (3) failed to establish the "fear" element of extortion. Each of the three defendants also argue that, in the alternative, they are entitled to a new trial because I erroneously failed to give requested charges regarding lesser-included offenses and/or their theory of the case in the jury instructions.

For the following reasons, the defendants' Motions for Judgment of Acquittal and/or New Trial are **denied**.

---

[4] Cabrera was acquitted of three counts of kidnapping (Counts Ten, Twelve, Thirteen). *See* Verdict, Doc. No. 225.

## I. Background

The following general factual allegations were alleged by the government and introduced at trial. More specific factual allegations for each count will be described in more detail below. In general, the government alleged that the defendants' kidnapping and extortion plan stemmed from their scheme to trick people into accompanying them in a purported taxi, driving the person from New York to Connecticut, and demanding payment from the person's family members. The plan was executed by one or more of the defendants waiting at Port Authority in New York City and identifying people who had traveled from Central or South America, entered the United States illegally, and were detained at the border before being sent to their family members in Connecticut by bus.[5]

One or more of the defendants would then approach the person, take their bus tickets, and misinform them that they had missed their bus to Connecticut and/or had arrived in the wrong place. The defendant(s) then offered to get the person to Connecticut via taxi, and called the person's relative to tell them their lost relative was coming via taxi, not bus. One or more of the defendants would then purport to be a taxi driver and would drive the person to Connecticut.[6] Upon arrival, the defendant(s) would demand payment from the family members, who are the alleged extortion victims. The extortion victims paid the "taxi fare", which was usually around $1,000 for the trip.

---

[5] While detained, the immigrants were given a GPS monitoring bracelet to wear on their ankles and an envelope containing their paperwork that had written on it a message that generally stated: "I do not speak English. Please help me find my bus." It was the government's general allegation that the defendants were able to easily identify their victims based upon those indicators.

[6] As explained in further detail below, where the victim asked to be let out of the car, the defendants were convicted of kidnapping. Where the victims did not ask to be let out of the car, the defendants were acquitted. Betancourt argues that the acquittals occurred "notwithstanding the fact that the theory of the case … was precisely the same" for each occurrence and, therefore, there were inconsistent verdicts. Betancourt Mem. in. Supp., Doc. No. 257 at 1. The distinction between whether the victim asked to be let out is an important one that sets some counts apart from others; a distinction on which the jury seemed to rely. Accordingly, the verdicts were not inconsistent.

The defendants argued, generally, that although they took advantage of the victims, they did not kidnap or extort them. Further, the defendants called into question the victims' motivation in testifying against the defendants because many of them were in the process of applying for a U-Visa, a visa for victims of violent crimes, in order to stay in the country. The jury convicted each defendant of at least one kidnapping and one extortion charge as well as the two conspiracy charges.

## II.    Motions for Judgment of Acquittal

### A.    Standard

Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. "A defendant seeking to overturn a conviction on the ground that the evidence was insufficient bears a heavy burden." *United States v. Best*, 219 F.3d 192, 200 (2d Cir. 2000), *cert. denied*, 121 S. Ct. 1733 (2001). The reviewing court must view the evidence in the light most favorable to the prosecution and must reject the sufficiency challenge if it concludes that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998) ("[t]he ultimate question is not whether [the court believes] the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether *any rational trier of fact could so find*" (emphasis in original)). A reviewing court must consider the evidence as a whole, not in isolation. *Best*, 219 F.3d at 200; *see also United States v. Memoli*, 2015 WL 1525864, at *2 (D. Conn. Apr. 2, 2015) ("In order to prevail on a Rule 29 Motion, Defendant must establish that the *totality* of the evidence is insufficient to convict him—it is irrelevant that one piece of

evidence, standing alone, would not have been enough." (Emphasis in original).). The "pieces of evidence must be viewed 'not in isolation, but in conjunction.'" *Memoli*, 2015 WL 1525864, at *2 (quoting *United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir. 1989)).

Further, the court must defer to the jury's determination of the weight of the evidence, credibility of witnesses, and competing inferences that can be drawn from the evidence. *Best*, 219 F.3d at 200. The district court must "assum[e] that the jury resolved all questions of witness credibility and competing inferences in favor of the prosecution." *United States v. Abu–Jihaad*, 630 F.3d 102, 134 (2d Cir. 2010) (internal citations omitted); *see also United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998) ("We defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of competing inferences that can be drawn from the evidence."). The jury is "exclusively responsible" for determinations of witness credibility; *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993); and the court must be "careful to avoid usurping the role of the jury since Rule 29 does not provide the trial court with an opportunity to substitute its determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (internal quotation marks omitted). The court should defer to the jury's credibility assessments and intrude upon that function only where "exceptional circumstances can be demonstrated" such as when "testimony is patently incredible or defies physical realities." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).

B.  Discussion

In their motions, the defendants argue that they are entitled to judgments of acquittal on all counts because the government: (1) failed to establish the "taking" element of kidnapping; (2)

failed to establish the "holding" element of kidnapping; and (3) failed to establish the "fear" element of extortion.

    1. *Substantive Crimes*

        a. Legal Principles

            i. <u>Kidnapping</u>

Each of the defendants was found guilty of conspiracy to commit kidnapping (Count One), and multiple counts of substantive kidnapping: Betancourt and Hernandez were each found guilty of three counts (Counts Three, Four, and Five); and Cabrera was found guilty of two counts (Counts Fifteen and Sixteen). *See* Verdict, Doc. No. 225.

The defendants were charged and convicted pursuant to 18 U.S.C. § 1201(a)(1), which provides, in relevant part, that a person commits kidnapping when he:

> [U]nlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when … the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary, or the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense[.]

18 U.S.C. § 1201(a)(1). Accordingly, the government must prove each of the three elements of kidnapping beyond a reasonable doubt: (1) taking; (2) holding; (3) interstate commerce.[7] *See United States v. Corbett*, 750 F.3d 245, 251 (2d Cir. 2014). "The very nature of the crime of kidnapping requires that the kidnapper use some means of force—actual or threatened, physical or mental—in each elemental stage of the crime, so that the victim is taken, held and transported against his or her will …. [I]t is 'the involuntariness of seizure and detention which is the very

---

[7] The interstate commerce element means the victim was "transported in interstate or foreign commerce." *United States v. Corbett*, 750 F.3d 245, 251 (2d Cir. 2014). The defendants do not argue that the government failed to meet its burden on that element.

essence of the crime of kidnapping.'" *Macklin*, 671 F.2d at 64 (quoting *Chatwin v. United States*, 326 U.S. 455, 464 (1946)). The defendants argue that the government failed to establish the "taking" and "holding" elements of kidnapping and, therefore, they should be acquitted of kidnapping and conspiracy to commit kidnapping.

The "taking" element means that "the victim [was] unlawfully taken, coerced, or deceived into accompanying the accused[.]" *Corbett*, 750 F.3d at 251. Here, the government charged the defendants with kidnapping by inveiglement. "Inveiglement" involves a nonphysical taking and means "to entice, lure, or lead astray, by false representations or promises, or by other deceitful means." *United States v. Macklin*, 671 F.2d 60, 64 (2d Cir. 1982).

The "holding" element means that the victim was "held by the accused for ransom, reward or otherwise[.]" *Corbett*, 750 F.3d at 251. "[T]he act of holding a kidnapped person for a proscribed purpose necessarily implies an unlawful physical or mental restraint for an appreciable period against the person's will and with a willful intent so to confine the victim." *Chatwin*, 326 U.S. at 460. "Holding" incorporates situations in which the victim is "deprived of [his or] her liberty, compelled to remain where [he or] she did not wish to remain, or compelled to go where [he or] she did not wish to go." *Id*. If a victim "was perfectly free to leave the [defendants] when and if [he or] she desired," then the government has "failed to prove an act of unlawful restraint" and, accordingly, failed to prove the "holding" element. *Id*.

When the taking element is accomplished via nonphysical means (i.e., inveiglement), the courts are split on whether the kidnapping statute "covers a defendant who *continues* to use trickery to 'hold' his victim captive, without resorting to physical or psychological coercion." *Corbett*, 750 F.3d at 251 (emphasis in original); *see also United States v. Higgs*, 353 F.3d 281,

7

313 (4th Cir. 2003) ("holding" requirement satisfied when defendant exhibited the willingness and ability to use force if the inveiglement failed); *United States v. Boone*, 959 F.2d 1550, 1556 (11th Cir. 1982) (same); *but see United States v. Stands*, 105 F.3d 1565, 1569 (8th Cir. 1997) ("holding" requirement satisfied when defendant continues to hold the victim by trickery); *United States v. Carrion-Caliz*, 944 F.2d 220, 225-27 (5th Cir. 1991) (same).[8]  The Second Circuit has yet to determine whether the "holding" element of kidnapping is satisfied when a victim is taken and held by trickery, or whether the defendant must have the willingness and ability to use force to hold the victim in the event the trick fails.  *See Corbett*, 750 F.3d at 251-52 ("Focusing, as we do, on the defendant's intent, we need not, and hence do not, decide today whether [section] 1201(a) may be satisfied when a victim is 'held' only by the victim's continuing belief in his kidnapper's dupe.").

The Second Circuit has determined that the holding requirement is met when the government produces sufficient evidence that the defendant intended to lure the victim someplace and further intended to hold the victim against his or her will.  *Id*.; *see also id.* at 252 (the evidence permitted "the fact-finder to conclude beyond a reasonable doubt, that [the defendant] *intended* to [and did] 'take,' 'hold,' and 'transport' [the victim] from New York to Connecticut, against [the victim's] will" (emphasis in original)).

ii.  Hobbs Act Extortion

The defendants were each found guilty of conspiracy to commit Hobbs Act extortion (Count Two), and each of the defendants was found guilty of multiple counts of substantive

---

[8] Cabrera and Hernandez argue that the government failed to prove the *taking* element of kidnapping because, in part, it failed to establish that the defendants had the willingness and ability to use physical force, should the trick fail.  *See* Cabrera Mem. in Supp, Doc. No. 256 at 6-7; Hernandez Mem. in Supp., Doc., No. 258 at 13-14.  Although the caselaw is unsettled whether the willingness to use physical force is necessary in an inveiglement situation, the caselaw is clear that the consideration relates to the *holding* element, rather than the *taking* element of kidnapping.

Hobbs Act extortion: Betancourt was found guilty of three counts (Counts Six, Nine, and Eleven); Hernandez was found guilty of two counts (Counts Six and Nine); and Cabrera was found guilty of three counts (Counts Eleven, Fourteen, and Seventeen). *See* Verdict, Doc. No. 225.

The defendants were charged and convicted pursuant to 18 U.S.C. § 1951(a), the Hobbs Act, which "prohibits … extortion—including conspiracy and attempt—that affects interstate commerce." *United States v. Kirsch*, 903 F.3d 213, 221 (2d Cir. 2018) (citing 18 U.S.C. § 1951(a)). The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear[.]" 18 U.S.C. § 1951(b)(2). "[T]he Hobbs Act requires 'that a person must obtain property from another party to commit extortion.'" *Kirsch*, 903 F.3d at 226 (quoting *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393, 404 (2003)). "[E]xtortion 'requires that the victim part with his property, and that the extortionist gain possession of it' …. [Thus,] 'property extorted must … be transferable—that is, capable of passing from one person to another.'" *Id.* (quoting *Sekhar v. United States*, 570 U.S. 729, 734 (2013)).

The defendants argue that the government failed to establish the "fear" element of extortion and, therefore, they should be acquitted of Hobbs Act extortion and conspiracy to commit Hobbs Act extortion. In order to establish the fear element, the government must prove "that the defendant knowingly and willfully created or instilled fear, or used or exploited existing fear with the specific purpose of inducing another to part with property." *United States v. Coppola*, 671 F.3d 220, 241 (2d Cir. 2012). "[T]he Hobbs Act 'leaves open the cause of the fear' inducing a party to consent or part with property and does not require that such fear be 'created by implicit or explicit threats.'" *Id.* (quoting *United States v. Gotti*, 459 F.3d 296, 333

(2d Cir. 2006)). The fear requirement may be satisfied by a fear of injury, or a fear of economic harm, whether immediately or in the future. *United States v. Fazio*, 770 F.3d 160, 166 (2d Cir. 2014).

"The cases interpreting the Hobbs Act have repeatedly stressed that the element of 'fear' required by the Act can be satisfied by putting the victim in fear of economic loss." *United States v. Brecht*, 540 F.2d 45, 52 (2d Cir. 1976) (en banc), *cert. denied*, 429 U.S. 1123 (1977) (citations omitted); *see also United States v. Capo*, 817 F.2d 947, 950 (2d Cir. 1987) ("The government successfully prosecuted [the] defendants under the theory that their activities amounted to extortion by wrongful use of fear—specifically, fear of economic loss."). "The absence or presence of fear of economic loss must be considered from the perspective of the victim, not the extortionist; the proof need establish that the victim *reasonably* believed: first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment." *Id.* (emphasis in original).

In establishing the element of fear, the use of weapons may bear on the reasonableness of the fear; *see United States v. Rodriguez*, 68 F. App'x 237, 241 (2d Cir. 2003) (finding that fear of harm was reasonable where victims were previously threatened with baseball bats and where victims saw defendant draw a firearm); however, the "Hobbs Act does not require the brandishing of a weapon … [and] the use of a weapon is not a prerequisite for a finding of force." *United States v. Santos*, 449 F.3d 93, 100 (2d Cir. 2006). Indeed, "a direct threat of future harm is not necessary to establish the reasonableness of the alleged victim's fear." *United States v. Covino*, 837 F.2d 65, 68 (2d Cir. 1988), *superseded on other grounds by United States v. Rybicki*, 287 F.3d 257 (2d Cir. 2002). Further, evidence of a victim's cordiality with the

extortionist does not preclude a finding that a payment was induced by fear. *Coppola*, 671 F.3d at 242 (citing *United States v. Hedman*, 630 F.2d 1184, 1194 (7th Cir. 1980)).

### iii. Aiding and Abetting

The defendants also were all charged with aiding and abetting each other in committing the various crimes. The aiding and abetting statute, 18 U.S.C. § 2, provides that someone can be found guilty of aiding and abetting a crime and can be punished as a principal if he: "(a) . . . aids or abets or counsels, commands or induces, or procures [an offense's] commission" or "(b) … willfully causes an act to be done which, if directly performed by him, or another would be an offense against the United States." To prove a defendant guilty under subsection (a), "the government must prove that the underlying crime was committed by a person other than the defendant, that the defendant knew of the crime, and that the defendant acted with the intent to contribute to the success of the underlying crime." *United States v. Huezo*, 546 F.3d 174, 179 (2d Cir. 2008) (citations omitted) (internal quotation marks omitted), *cert. denied*, 558 U.S. 936 (2009). In order to prove the defendant acted with specific intent, "the government need not establish that he knew all of the details of the crime, only that he joined the venture, [that he] shared in it, and that his efforts contributed toward its success." *Id*. at 179-80 (internal quotation marks omitted).

### b. Analysis

#### i. Counts Three, Four, Five, and Six (Betancourt and Hernandez)

In Counts Three, Four, Five, and Six, Betancourt and Hernandez were convicted of kidnapping Irma Mata Lopez ("Irma") (Count Three), her minor son (Count Four), and her minor

daughter (Count Five), and were convicted of extorting Irma's sister, Dilcia Mata Lopez ("Dilcia")[9] (Count Six).

The following facts, which the jury could have reasonably found from the evidence introduced at trial, are relevant to the counts at issue here. Irma traveled to Texas from her home in Honduras in September 2016 with her six-month-old daughter and six-year-old son. Tr. 2/27/18, Doc. No. 210 at 46-50. She was detained by immigration authorities in Texas where she was given a GPS monitoring bracelet and held for a few days before being released with her children. *Id*. at 50, 56-57. Irma testified that "at any moment an immigration official might show up because the monitor tells them where [she is.]" *Id*. at 64-65. Immigration personnel called Dilcia, who was living in Connecticut, and Dilcia purchased bus tickets for Irma and her two children to travel from Texas to Connecticut. *Id*. at 60-61; Tr. 2/28/18, Doc. No. 211 at 252. When she arrived at Port Authority bus terminal in New York City, Irma was approached by a man, later identified as Betancourt,[10] who took her tickets to Hartford and told her that her bus had already left. Tr. 2/27/18, Doc. No. 210 at 66-67, 71. He also told Irma that he had a taxi and would get her to her sister's house. *Id*. at 71. Betancourt asked Irma for Dilcia's phone number and called Dilcia, though Irma testified that she was not allowed to speak to Dilcia. *Id*. at 71-72. Dilcia testified that she received a call from an unknown person who told her he had her sister because she had missed her bus to Hartford and she was very far from the station where she was supposed to arrive. Tr. 2/28/18, Doc. No. 211 at 239. Betancourt told Dilcia that he would take Irma to Connecticut for $3.00 or $3.50 per mile, but Dilcia said it was too much money. *Id*. Dilcia told Betancourt to pick a spot where they could meet so she could pick up Irma and her

---

[9] To avoid confusion, I will refer to Irma Mata Lopez and Dilcia Mata Lopez by their first names.
[10] *See* Gov. Ex. 21.

children, but Betancourt did not give her a location, and Dilcia testified that she felt she had no choice about having Irma put into a cab and she was fearful for Irma's safety. *Id*. at 240, 331-33.

Betancourt then took Irma's son by the hand and walked "ahead of" Irma, who was carrying her daughter, to the subway. Tr. 2/27/18, Doc. No. 210 at 71-72. When they got off the subway, Betancourt again "grabbed the hand of" Irma's son and "walked through some people." *Id*. at 75. Irma testified that she could "see him from a distance", but sometimes could not see him, and was "running … trying to reach him" because he had her son. *Id*. at 75-76. Irma testified, though, that "at no point" did she think Betancourt had "stolen" her son. *Id*. at 159. She followed Betancourt to where a man, later identified as Hernandez,[11] was cleaning a car that Betancourt told her was the "taxi that's going to take you to your destination." Tr. 2/27/18, Doc. No. 210 at 84. Irma testified that she protested because she did not believe it was a taxi because it did not have any taxi markings, but Betancourt assured her it was. *Id*. Irma, her children, and Betancourt entered the car, Irma and her children in the back and Betancourt in the passenger seat, and Hernandez took Irma's immigration paperwork from her and kept it. *Id*. at 85-86, 91-92. Hernandez drove for 10-15 minutes before stopping for food, for which Betancourt paid. *Id*. at 92-93. Betancourt then left the car and Hernandez continued to drive, and he drove past "many places that [Irma] had already passed when [she] was on the bus on [her] way to New York" before stopping at a rest stop. *Id*. at 93, 96. Hernandez did not let Irma's son use the restroom though, and told him to go to the bathroom in front of the car. *Id*. at 96. Dilcia called Hernandez and Irma heard him say "three fifty per mile" and then Hernandez allowed Irma to speak to Dilcia very briefly to tell her that she was okay. *Id*. at 93-95. Dilcia testified that she

---

[11] *See* Gov. Ex. 23-5; *see also* Tr. 2/27/18, Doc. No. 210 at 170.

started driving to Albany, New York because that seemed closer to where Betancourt told her Irma had arrived. Tr. 2/28/18, Doc. No. 211 at 242-43.

Irma testified that she told Hernandez to "let [her] out anywhere, that [she] would figure out how to call [her] sister." Tr. 2/27/18, Doc. No. 210 at 98. She testified that she may have told him one other time to let her out of the car. *Id*. at 108. Hernandez refused to let her out. *Id*. at 98. Dilcia also testified that she heard Irma ask Hernandez to drop her off anywhere. Tr. 2/28/18, Doc. No. 211 at 244. Hernandez arrived at the designated meeting spot and when Dilcia arrived with her husband Rigoberto Oriana and her friend Marlon Molestina, Irma left the car with her daughter but was "so excited" to see Dilcia that she "forgot to get [her] son." Tr. 2/27/18, Doc. No. 210 at 99. Hernandez then locked the doors of the car with Irma's son inside. *Id*. at 99-100. Molestina testified that he asked Hernandez why he locked Irma's son in the car and Hernandez said that he did not want them to leave without paying, and Molestina felt as though Hernandez was kidnapping Irma's son.[12] Tr. 2/28/18, Doc. No. 211 at 340-41. Eventually, Hernandez let Irma's son out of the car but kept their immigration paperwork. Tr. 2/27/18, Doc. No. 210 at 101.

Dilcia testified that Hernandez told her the ride cost more than a thousand dollars, and she protested because both she and Irma told him to let Irma off somewhere else. Tr. 2/28/18, Doc. No. 211 at 246. Dilcia testified that Hernandez said he had Irma's immigration documents, which would cost more than $2,000 to replace. *Id*. Dilcia did not have enough money, and she testified that "when [Hernandez] saw [they] didn't have the money, he wouldn't let go of the

---

[12] On cross-examination of Molestina, the defendants elicited testimony about Molestina's and Oriana's height and weight, as compared to Hernandez's, and seemed to suggest that Hernandez could have gotten into the car and locked the doors because he was afraid. Tr. 2/28/28, Doc. No. 211 at 357-59. Molestina testified that he did not think that Hernandez was afraid and said: "I'm a very friendly guy. No matter what, I'm tall, big guy, I'm very friendly. I was friendly with him." *Id*. at 360. Molestina also conceded that he was upset with Hernandez and also had no way of knowing how Hernandez was feeling. *Id*.

documents or the child" and Hernandez returned to the car. *Id*. Dilcia offered him $700 but Hernandez said it was not enough and they would need to find more money. *Id*. at 248. Dilcia testified that she "felt threatened" and "felt pressured because [Hernandez] had the boy with him." *Id*. They decided to find an ATM where Dilcia could get $100 to give him, and Hernandez let Irma's son out of the car, and drove by himself to the ATM, but kept the immigration paperwork and said "as long as [Dilcia] didn't give him the money, he was not going to give [her] the documents." *Id*.

Dilcia testified that she pretended to try to take the money out of the ATM but told Hernandez that she did not have any money to give him. Tr. 2/28/18, Doc. No. 211 at 249. She testified that he then "approached [her] and got close to [her]" and she was "very – very afraid" and thought he might pull a gun on her.[13] *Id*. Molestina testified that while Dilcia was at the ATM, Hernandez "was very close to [her and] to watching all the codes … to her card." *Id*. at 342. Molestina felt the situation was "dangerous for the ladies" because it was dark and he did not know if Hernandez had anyone follow him. *Id*. at 343. Dilcia took out the $100 and Hernandez had her talk to his boss, Betancourt, on the phone to tell him how much she had given Hernandez. *Id*. at 251-52. Hernandez then returned the immigration documents to Dilcia. *Id*. at 252. The government introduced surveillance footage from the 7-Eleven that showed Dilcia getting the money out of the ATM and also shaking Hernandez's hand. *Id*. at 263; *see also* Gov. Ex. 11. When asked why she shook his hand, Dilcia testified: "I don't know. Out of respect. I don't know. At that moment, with fear and everything just together, I don't know." Tr. 2/28/18, Doc. No. 211 at 263. Hernandez then left.

---

[13] Dilcia also testified that she told federal agents, when meeting with them about the incident, that she was afraid Hernandez might have a gun. Tr. 2/28/18, Doc. No. 211 at 299.

Viewing the evidence together, and in the light most favorable to the government, a reasonable jury could have found Betancourt and Hernandez guilty of both kidnapping and extortion. The defendants argue first that the government failed to establish both the taking and the holding elements of kidnapping. With respect to the taking element, there was ample evidence for the jury to determine that Irma and her children were "taken" by inveiglement because she was deceived into accompanying Betancourt when he falsely represented to her that she had missed her bus. Further, there was evidence to support a conclusion that Irma was coerced to follow Betancourt through his use of psychological force when he took her son by the hand and walked away, and also took her immigration paperwork and bus tickets. The evidence supports the conclusion that Irma had no choice but to follow Betancourt, as a result of both his deception and his psychological force. Accordingly, the jury reasonably could have found that the government had satisfied the first element of kidnapping: "taking."

With respect to the holding element, there was also ample evidence for the jury to determine that Irma and her children were held against their will. The jury heard evidence that Irma asked Hernandez to be let out of the car at least once and he refused. Accordingly, the jury could reasonably have found find that Irma and her children were "compelled to remain where [they] did not wish to remain." *Chatwin*, 326 U.S. at 460. Hernandez was aware that Irma wanted to leave and, therefore, intended to hold her against her will. *Corbett*, 750 F.3d at 251-52. The evidence supports the conclusion that Irma had no choice but to remain with Hernandez because he refused to let her out of the car and because she did not know where she was and did not have her immigration paperwork or bus tickets. Accordingly, the jury reasonably could have found that the government had satisfied the second element of kidnapping: "holding."

The defendants also argue that the government failed to prove that they extorted Dilcia because it failed to prove the element of fear. The jury reasonably could have found, however, that the defendants instilled fear in Dilcia that compelled her to pay. Dilcia testified that she protested about Irma being taken in a cab, but felt she had no choice because she was fearful for Irma's safety because she was told Irma was in upstate New York, far from where she was supposed to be. She also testified that she was only allowed to talk to Irma very briefly. Hernandez also locked Irma's son in the car and retained Irma's immigration documents, while reminding Dilcia how expensive they would be to replace, and refused to return them until he was paid. Further, Dilcia testified that Hernandez kept demanding more money, which made her feel threatened and pressured, and while at the ATM, Hernandez stood very close to Dilcia. Viewing this evidence in the light most favorable to the government, a reasonable jury could have found that Dilcia paid the money out of fear for her safety and Irma's. Moreover, the evidence supports the inference that Hernandez, through his statements and actions, knowingly created the fear that compelled Dilcia to pay.

Further, it was clear from the testimony that Betancourt and Hernandez were working together throughout the kidnapping of Irma and her two children, and the extortion of Dilcia and, therefore that they aided and abetted each other in the commission of the two crimes. Accordingly, Betancourt's and Hernandez's motions directed to their convictions on Counts Three, Four, Five, and Six are **denied**.

### ii. Counts Fifteen, Sixteen, and Seventeen (Cabrera)

In Counts Fifteen, Sixteen, and Seventeen, Cabrera was convicted of kidnapping Martina Arias Gutierrez ("Gutierrez") (Count Fifteen) and her minor son (Count Sixteen); and convicted of extorting her daughter's partner, Darwin Gonzalez ("Gonzalez") (Count Seventeen).

17

The following facts, which the jury could have reasonably found from the evidence introduced at trial, are relevant to the counts at issue here.  Gutierrez travelled from her home in Honduras to Texas in May 2017 with her seventeen-year-old son.  Tr. 2/28/18, Doc. No. 211 at 377-78.  They were detained by immigration authorities in Texas, where she was given a GPS monitoring bracelet and held for a few days before being released with her son.  *Id*. at 379, 384-85.  Gutierrez testified that she was cautioned not to go too far because her monitor could lose signal.  *Id*. at 385.  Immigration personnel called Gutierrez's daughter, Nubia Paz Arias ("Arias"), who was living in Connecticut, and Arias purchased bus tickets for Gutierrez and her son to travel from Texas to Connecticut.  *Id*. at 379-81; Tr. 3/1/18, Doc. No. 212 at 499.  Gutierrez and her son spent three days and nights on the bus before arriving at the Port Authority bus terminal in New York City on May 11, 2017.  Tr. 2/28/18, Doc. No. 211 at 387.  When they arrived at the bus station, Gutierrez was approached by a man, later identified as Pascual Rodriguez,[14] who said he was an immigration official, showed her an identification badge, and said he was waiting for her.  *Id*.  Rodriguez took Gutierrez's and her son's immigration paperwork and their bus tickets from Gutierrez.  *Id*. at 387-89.  At one point while at Port Authority, Rodriguez left with the paperwork and tickets to find a bathroom and, when he could not find Gutierrez, told her that he was worried and was "about to use the GPS that [she had on her] leg to find [her]."  *Id*. at 390.  Rodriguez then told Gutierrez that he had a taxi and was going to take them to her daughter's house.[15]  *Id.* at 392.

---

[14] *See* Tr. 2/28/18, Doc. No. 211 at 408.  Co-defendant Rodriguez was also charged in Counts Fifteen, Sixteen, and Seventeen, but was not a part of the trial here.  *See* footnote 1.

[15] Gonzalez testified that Gutierrez and her son were supposed to wait two hours in the terminal before getting on their last bus to Stamford.  Tr. 3/1/18, Doc. No. 212 at 500-01.  He decided to pick them up rather than have them wait for  two hours, and was fifteen minutes away from Port Authority when Arias called to tell him that someone else had picked up Gutierrez and her son.  *Id*. at 501.

Rodriguez called Arias, and Gutierrez was allowed to briefly speak to her and tell her that she was okay. *Id*. at 394. Rodriguez then took Gutierrez and her son to the taxi, where there was another man, later identified as Cabrera.[16] *Id*. at 394. On the way, Cabrera got food for Gutierrez and her son, but the two of them did not leave the car. *Id*. at 395-96. Gutierrez testified that no one was stopping her from leaving the car, but she didn't feel well, and also that she thought immigration had sent Cabrera, so she did not want to leave the car because she "was obligated to follow the immigration rules." Tr. 3/1/18, Doc. No. 212 at 481.

While driving, Cabrera called both Arias and Gonzalez and told them that Gutierrez had accidentally arrived in Buffalo, New York. Tr. 2/28/18, Doc. No. 211 at 396-97; Tr. 3/1/18, Doc. No. 212 at 538. Gutierrez testified that Gonzalez told Cabrera he "couldn't pay all that money" if Cabrera charged him per mile, and Cabrera responded that he "needed that money." Tr. 2/28/18, Doc. No. 211 at 410. Gonzalez testified that Cabrera told him the trip would be roughly $2,000 and when Gonzalez asked him to lower the price, Cabrera said he would think about it and call him back. Tr. 3/1/18, Doc. No. 212 at 503. Cabrera then called Gonzalez every hour from a blocked number, and the two agreed on $1,500. *Id*. Gonzalez testified that Cabrera would not tell him where they were but that it was a "very mountainous place." *Id*. at 504. Gutierrez told Cabrera that her family did not have the money and told him to drop her off anywhere, and Cabrera refused.[17] Tr. 2/28/18, Doc. No. 211 at 411; *see also* Tr. 3/1/18, Doc. No. 212 at 485-86. Gutierrez testified that she was afraid and felt like she could not leave. *Id*.; *see also id.* at 418. Cabrera stopped one time for Gutierrez's son to use the bathroom, and

---

[16] *See* Gov. Ex. 26.

[17] On cross-examination, Gonzalez first testified that Cabrera told him he would stop somewhere for Gonzalez to meet them. Tr. 3/1/18, Doc. No. 212 at 531-32. But then also testified that Cabrera did not give him that option. *Id*. at 532. Arias testified that Cabrera told Gonzalez he could not leave Gutierrez for them to pick up, although Gonzalez asked. Tr. 3/2/18, Doc. No. 213 at 606. Regardless, there is no indication that Cabrera discussed that option with Gutierrez when she told him to let her out.

Cabrera went in with him. *Id*. at 412. Gutierrez stayed in the car, and she testified that she did not have a cell phone or any money. *Id*. at 414. They arrived at Arias' house eight hours after Gutierrez was picked up at Port Authority. Tr. 3/1/18, Doc. No. 212 at 505. Gutierrez testified that no one came to meet them outside, but Cabrera opened the car door for them and then they knocked on the door and they all, including Cabrera,[18] went inside Arias' house. *Id*. at 412-13.

Gonzalez testified, however, that when Cabrera arrived with Gutierrez and her son, Cabrera called Gonzalez to come outside. Tr. 3/1/18, Doc. No. 212 at 505. Gonzalez went up to the car and Cabrera just lowered the window and said "here's your family" and let Gutierrez and her son out of the car. *Id*. They all went inside and then Cabrera and Gonzalez went to the bank so Gonzalez could withdraw $800 because he did not have enough cash at home. *Id*. at 506-07. In total, Gonzalez paid Cabrera $1,500. *Id*. at 508. Gonzalez testified that he paid Cabrera because he felt responsible for his family and he felt he had no option but to pay because he did not know what would happen to his family if he did not pay. *Id*. at 511-12, 545. He also testified that he was afraid of Cabrera because Cabrera knew where they lived and he didn't know if Cabrera would "take action against" his family. *Id*. at 517. Arias also testified that they paid Cabrera out of fear and because they thought they had no other choice. *Id*. at 572.

Viewing the evidence together, and in the light most favorable to the government, a reasonable jury could have found Cabrera guilty of both kidnapping and extortion. Cabrera argues that the government failed to establish both the taking and the holding elements of kidnapping. With respect to the taking element, there was ample evidence for the jury to determine that Gutierrez and her son were "taken" by inveiglement because she was deceived into accompanying Rodriguez when he falsely represented to her that he was an immigration

---

[18] Gutierrez testified that they knocked on the door when they arrived and Gonzalez opened the door and invited Cabrera inside and offered him juice. Tr. 3/1/18, Doc. No. 212 at 492-93.

official and had been looking for her and that she had to follow him to a taxi that would take her to Connecticut. Further, there was evidence to support a conclusion that Gutierrez was coerced to follow Rodriguez through his use of psychological force when he took her immigration paperwork and bus tickets and told her to follow him, particularly when coupled with his misrepresentation that he was an immigration official and also his statement that he could use the GPS bracelet on her ankle to find her if he needed to. The evidence supports the conclusion that Gutierrez had no choice but to follow Rodriguez, due to his deception and his use of psychological force. Accordingly, the jury reasonably could have found that the government satisfied the first element of kidnapping: "taking."

With respect to the holding element, there was also ample evidence for the jury to determine that Gutierrez and her son were held against their will. The jury heard evidence that Gutierrez told Cabrera to let her out of the car at least once and he refused. Accordingly, the jury could reasonably have found that Gutierrez and her son were "compelled to remain where [they] did not wish to remain." *Chatwin*, 326 U.S. at 460. Cabrera was aware that Gutierrez wanted to leave and, therefore, intended to hold her against her will. *Corbett*, 750 F.3d at 251-52. The evidence supports the conclusion that Gutierrez and her son had no choice but to remain with Cabrera because he refused to let her out of the car and because she did not know where she was and did not have her immigration paperwork or bus tickets. Accordingly, the jury reasonably could have found that the government satisfied the second element of kidnapping: "holding."

Cabrera also argues that the government failed to prove that he extorted Gonzalez because it failed to prove the element of fear. The jury reasonably could have found, however, that Cabrera instilled fear in Gonzalez that compelled him to pay. Gonzalez testified that both he and Arias protested Gutierrez being driven in a taxi, but Cabrera would not tell them where they

were, did not allow Gutierrez to get on the phone for very long, and called Gonzalez from a blocked number so Gonzalez could not call back. Further, the trip took eight hours and Cabrera kept telling Gonzalez they were almost there, and then would not arrive when he said they would. There was evidence that when they did arrive, Cabrera did not immediately let Gutierrez out of the car. Gonzalez testified that he paid Cabrera because he felt like he had no other choice and he did not know what would happen to his family if he did not pay. He also was worried Cabrera would take future action against them. Viewing that evidence in the light most favorable to the government, it was reasonable for the jury to find that Gonzalez paid the money out of fear for his safety and the safety of his family and, further, the evidence supports the inference that Cabrera knowingly created that fear based on his statements and actions, which compelled Gonzalez to pay.

Further, it was clear from the testimony that Rodriguez and Cabrera were working together throughout the kidnapping of Gutierrez and her son, and the extortion of Gonzalez and, therefore that they aided and abetted each other in the commission of the two crimes. Accordingly, Cabrera's motions directed to his conviction on Counts Fifteen, Sixteen, and Seventeen are **denied**.

### iii. Count Nine (Betancourt and Hernandez)

In Count Nine, Betancourt and Hernandez were convicted of extorting Dina Velazquez ("Velazquez"). The following facts, which the jury could reasonably have found from the evidence introduced at trial, are relevant to the count at issue here. Velazquez is the cousin of Reyna Salazar Gregorio ("Gregorio").[19] Tr. 3/5/18, Doc. No. 215 at 871. Gregorio traveled to

---

[19] Betancourt and Hernandez were charged in Counts Seven and Eight with kidnapping Gregorio and her minor son. *See* Third. Super. Indict., Doc. No. 141. They were acquitted on both counts. *See* Verdict, Doc. No. 225.

Arizona from her home in Guatemala in October 2016 with her one-year-old son.[20] *Id.* at 811-12. They were detained by immigration authorities who contacted Velazquez to purchase bus tickets for Gregorio and her son to come to Connecticut. *Id.* at 813. When Gregorio arrived at the Port Authority bus terminal in New York, a man, later identified as Betancourt, approached her and took her tickets, told her that her bus had left, and that the terminal was about to close, but said that he would get her a taxi. *Id.* at 819. The taxi arrived, driven by a man later identified as Hernandez,[21] and Gregorio, her son, and Betancourt got in. *Id.* at 821-22.

Betancourt called Velazquez and told her that he was a taxi driver and was with Gregorio, who had missed her bus. Tr. 3/5/18, Doc. No. 215 at 875-77. Velazquez agreed to have the taxi bring Gregorio and her son because Velazquez was "worried about her and her son" and there wasn't anything she could do. *Id.* at 878-79. While they were driving, Hernandez called Velazquez and told her that he was going to charge her $2.50 per mile and Velazquez testified that she was working when he called and "didn't think about it" and told him that was fine. *Id.* at 880. Velazquez testified that at the time, she "had no idea" how much the trip would cost, but thought it would be $200 or $300. *Id.* at 881. Hernandez called back later and Velazquez gave him her address so he could bring Gregorio there, and Hernandez told her she had to be there when they arrived, so Velazquez left work early. *Id.* at 882-83. When Velazquez got home, she testified that she was expecting to see a taxi, but instead saw a van and when she approached, Hernandez rolled down the window and told her that Gregorio was there, though Velazquez could not see her through the tinted windows. *Id.* at 883. Velazquez tried to open the door but could not open it because Hernandez "didn't want that." *Id.* at 884. Gregorio testified that when

---

[20] Gregorio also traveled with her twelve-year-old nephew, Velazquez's son, but he was sent to a children's home upon being detained and did not travel with Gregorio after that. Tr. 3/5/18, Doc. No. 215 at 811-13.
[21] *See* Tr. 3/5/18, Doc. No. 215 at 831; *see also* Gov. Ex. 43-3.

they arrived at Velazquez's house the car door was locked, and she couldn't get out of the car. *Id*. at 828.

Hernandez then told Velazquez through the rolled down window that the trip cost $1,700 or $1,800. Tr. 3/5/18, Doc. No. 215 at 828, 884. Velazquez told Hernandez that she did not have that much money, and Hernandez asked her if there was a neighbor from whom she could borrow the money. *Id*. at 885. Velazquez had $300 and a neighbor loaned her $700 but Hernandez told her to take out more at an ATM. *Id.* at 885-86. Velazquez testified that she agreed to go get more money because she was thinking that "he was not letting [Gregorio] out [of the car] and that he could possibly take her." *Id*. at 887. Gregorio testified that Hernandez told Velazquez that she "had to pay first so [Gregorio] could get out of the car." *Id*. at 829.

Velazquez and her daughters got into the car so Hernandez could take her to the bank. *Id*. at 829, 887. Velazquez had never used an ATM before and tried unsuccessfully to take the money out. *Id*. at 888. When she told Hernandez that, he went in with her to help and she took out $400, after which Hernandez told her to try again to see if should get any more, and so she took out another $100. *Id*. at 888-89. Velazquez testified that she was nervous and worried at the ATM and withdrawing the money was important to her so that Hernandez would let Gregorio out of the car. Tr. 3/6/18, Doc. No. 216 at 925-27. Velazquez testified that she was afraid that Hernandez would take Gregorio and her son if she did not pay. *Id*. at 957. Velazquez gave Hernandez the $1,500, who then called Betancourt and had Velazquez tell him she had paid him $1,000. Tr. 3/5/18, Doc. No. 215 at 889. After receiving the money, Hernandez gave Gregorio back her immigration paperwork that he had been holding. *Id*. at 891.

Viewing the evidence together, and in the light most favorable to the government, a reasonable jury could have found Hernandez and Betancourt guilty of extortion. Hernandez and

Betancourt argue that the government failed to prove that they extorted Velazquez because it failed to prove the element of fear. The jury reasonably could have found, however, that Hernandez, aided and abetted by Betancourt, instilled fear in Velazquez, compelling her to pay. Velazquez testified that she felt she had no choice but to agree for Gregorio and her son to travel by taxi because she was worried about their safety. She also testified that when she went up to Hernandez's car, he only unrolled the window a little bit and she could not see Gregorio in the car, and Hernandez would not let her open the door. Further, Velazquez testified that she paid so that Hernandez would let her family out of the car, and Hernandez kept demanding more and more money from her and even helped her take more out from the ATM. Hernandez had Gregorio's immigration documents in his possession the entire time and did not give them back until she paid him all of the money. Viewing that evidence in the light most favorable to the government, it was reasonable for the jury to conclude that Velazquez paid the money out of fear for her safety and the safety of her family and, further, the evidence supports the inference that Hernandez knowingly created that fear based on his statements and actions, which compelled Velazquez to pay.

Further, it was clear from the testimony that Betancourt and Hernandez were working together throughout the extortion of Velazquez and, therefore that they aided and abetted each other in the commission of the crime. Accordingly, Betancourt's and Hernandez's motions directed to their convictions on Count Nine are **denied**.

### iv. Count Eleven (Betancourt and Cabrera)

In Count Eleven, Betancourt and Cabrera were convicted of extorting William Ruben Archila Avila ("Avila"). The following facts, which the jury could have reasonably found from the evidence introduced at trial, are relevant to the count at issue here. Avila and Alan Josue

Avila Santiago ("Santiago") are cousins.[22] Tr. 3/6/18, Doc. No. 217 at 1102. When he was seventeen years old, Santiago traveled to Arizona from his home in Guatemala in October 2016 and was captured by immigration authorities at the border. *Id*. at 1046-49. He was sent to a children's home for a few days and then, when he turned 18, he was arrested by immigration agents. *Id*. at 1049. He was given a GPS monitoring bracelet and was sent by bus to Connecticut where Avila lived. *Id*. at 1049-50. When Santiago arrived at Port Authority in New York, he was approached by a man, later identified as Betancourt,[23] who asked him where he was going and took the ticket from Santiago's hand. *Id*. at 1054-55. Betancourt told Santiago that due to protests, he would not be able to travel by bus, but he could get Santiago to New Haven by taxi. *Id*. at 1055.

Betancourt called Avila and told him that he had Santiago with him and allowed Santiago to speak to Avila for no more than thirty seconds to say he was okay. *Id*. at 1056. Betancourt told Avila that they were in Buffalo, New York and Avila testified that he "felt doubt and … felt fear because [he] thought that was very strange." *Id*. at 1108. Avila kept asking for an address so he could pick Santiago up, but Betancourt insisted that they would bring Santiago to New Haven. *Id*. at 1109. Avila was told it would cost $3.50 per mile and calculated the trip from Buffalo to New Haven, which was more than $1,500, and told Betancourt he did not have that much money. *Id*. at 1110-11. Betancourt told him he would charge him $3.00 per mile, and Avila testified that he agreed because he was "fearful for [Santiago's] life." *Id*. at 1111-12.

Betancourt and Santiago took the subway to where Cabrera[24] was waiting with the taxi, though Santiago testified that he thought it did not look like a taxi. *Id*. at 1058. Cabrera drove

---

[22] Betancourt and Cabrera were charged in Count Ten with kidnapping Santiago. *See* Third. Super. Indict., Doc. No. 141. They were acquitted on that count. *See* Verdict, Doc. No. 225.
[23] *See* Tr. 3/6/18, Doc. No. 217 at 1056-57; *see also* Gov. Ex. 50-4.
[24] *See* Tr. 3/6/18, Doc. No. 217 at 1059; *see also* Gov. Ex. 51-3.

for a few minutes before letting Betancourt out of the car, and when he left, Betancourt did not

return Santiago's bus tickets. *Id*. at 1060. Cabrera stopped to get Santiago food and water and

then told him the trip would take five hours, "if [they] were lucky." *Id*. at 1061. When they

arrived, Cabrera called Avila to tell him they were there. *Id*. at 1112-13. When Avila went

outside, Cabrera and Santiago were outside of the car waiting for him. *Id*. at 1113. Cabrera

asked to use the bathroom, and Avila testified that he "didn't have an option", so they all went

inside. *Id*. at 1113-14, 1063. Cabrera then asked for the money, and Avila testified that when he

told Cabrera he only had $1,050, Cabrera seemed mad that he didn't have more money. *Id*. at

1114-15. Avila also testified that he paid Cabrera because he "felt fear for [his] life and

[Santiago's] life" because Cabrera knew who they were and where they lived, and he was

worried Cabrera would "take revenge."[25] *Id*. at 1116-17.

      Viewing the evidence together, and in the light most favorable to the government, a

reasonable jury could have found Betancourt and Cabrera guilty of extortion. Betancourt and

Cabrera argue that the government failed to prove that they extorted Avila because it failed to

prove the element of fear. The jury reasonably could have found, however, that Betancourt and

Cabrera instilled fear in Avila, compelling him to pay. Avila testified that he was immediately

skeptical and fearful when Betancourt told him that Santiago had ended up in Buffalo, not New

York City. Avila was not allowed to talk to his cousin for more than thirty seconds, and

Betancourt would not provide Avila with an address so he could pick up Santiago. Avila

testified that Cabrera demanded more money than he was able to give, and was mad that he did

not have more. Overall, Avila agreed to pay because he was afraid for Santiago's life and was

---

[25] Avila testified that when he was first contacted by the FBI, he declined to meet because he "did not want to have any problems" with Cabrera because he "didn't know what kind of person he was." Tr. 3/6/18, Doc. No. 217 at 1118; *see also* Tr. 3/7/18, Doc. No. 218 at 1128-29. Avila eventually met with the FBI. Tr. 3/7/18, Doc. No. 218 at 1129.

worried that Cabrera would take revenge on him because he knew where Avila lived.  The jury was free to determine whether Avila's testimony that he was fearful was credible.  Viewing that evidence in the light most favorable to the government, it was reasonable for the jury to find that Avila paid the money out of fear for his safety and the safety of his family and, further, the evidence supports the inference that Cabrera knowingly created that fear based on his statements and actions, which compelled Avila to pay.

Further, it was clear from the testimony that Betancourt and Cabrera were working together throughout the extortion of Avila and, therefore that they aided and abetted each other in the commission of the crime.  Accordingly, Betancourt's and Cabrera's motions directed to their convictions on Count Eleven are **denied**.

### v.  Count Fourteen (Cabrera)

In Count Fourteen, Cabrera was convicted of extorting Elvin Abrego Montoya ("Montoya").  The following facts, which the jury could have reasonably found from the evidence introduced at trial, are relevant to the count at issue here.  Montoya's wife is the sister-in-law of Noe Zacarias Garcia ("Garcia").[26]  Tr. 3/6/18, Doc. No. 217 at 1029.  Garcia traveled to Texas from his home in Honduras in January 2017 with his eight-year-old son.  Tr. 3/6/18, Doc. No. 216 at 962-63.  They were detained by immigration authorities for three days before being sent by bus to Montoya's house in East Hartford, Connecticut.  *Id*. at 964-65.  When Garcia arrived at Port Authority in New York, a man, later identified as Cabrera,[27] approached him and asked if he needed help.  *Id*. at 971.  Garcia handed him his bus tickets and immigration paperwork and Cabrera told Garcia that he was lost and was "close to Canada", which was

---

[26] Cabrera was charged in Counts Twelve and Thirteen with kidnapping Garcia and his minor son.  *See* Third. Super. Indict., Doc. No. 141.  He was acquitted on both counts.  *See* Verdict, Doc. No. 225.
[27] *See* Tr. 3/6/18, Doc. No. 216, at 985; *see also* Gov. Ex. 39-4.

outside of the acceptable range for the GPS monitoring bracelet that Garcia was given by immigration agents and Garcia could be arrested. *Id*. at 972, 976.

Cabrera asked if there was someone he could call, and Garcia gave him Montoya's phone number. *Id*. at 973. Cabrera told Montoya that Garcia was lost in Buffalo, New York and there were no more buses. Tr. 3/6/18, Doc. No. 217 at 1031. Montoya asked to speak to Garcia because he wanted to tell him to go back inside the bus station because Montoya had the "intuition that [Cabrera] was hiding something" but Cabrera hung up. *Id*. at 1031-32. Cabrera called back and told him he would take Garcia in a taxi, and Montoya said he would pick Garcia up but Cabrera refused to give him the address. *Id*. at 1032. Cabrera told Montoya he would take Garcia for $1,000 but Montoya said he did not have enough money. Tr. 3/6/18, Doc. No. 216 at 973-75. After a few calls, Cabrera agreed to lower the price to $600. *Id*. at 974-75; *see also* Tr. 3/6/18, Doc. No. 217 at 1032-33. Montoya told Cabrera to bring Garcia to a certain address, but gave Cabrera an old address "out of fear." Tr. 3/6/18, Doc. No. 217 at 1033-34.

The trip took five and a half hours during which Cabrera kept Garcia's bus tickets with him. Tr. 3/6/18, Doc. No. 216 at 980. When they arrived, Garcia asked for the tickets back because he felt a "certain mistrust" and didn't want Cabrera to have Montoya's address, which was written on the tickets. *Id*. at 980-82. When Montoya arrived at the location, Cabrera got out of his car, but Garcia and his son stayed inside. Tr. 3/6/18, Doc. No. 216 at 978-79; Tr. 3/7/18, Doc. No. 217 at 1034. Cabrera asked Montoya for the money, plus some extra for gas and food, and Montoya paid Cabrera roughly $700 and then Cabrera let Garcia and his son out of the car.[28] *Id*. Montoya testified that he was afraid and did not want to put Garcia's life in danger because

---

[28] Garcia also testified on direct examination that Montoya paid Cabrera first and then Cabrera let him out of the car. Tr. 3/6/18, Doc. No. 216 at 979-80. He testified on cross examination, though, that he got out of the car before Montoya paid Cabrera. Tr. 3/6/18, Doc. No. 217 at 1020-21.

he did not know whether Cabrera was armed. *Id*. at 1037. Montoya also testified that he thought that if he did not pay they money, Cabrera was not going to let Garcia and his son out of the car. *Id*. at 1041.

Viewing the evidence together, and in the light most favorable to the government, a reasonable jury could have found Cabrera guilty of extortion. Cabrera argues that the government failed to prove that he extorted Montoya because it failed to prove the element of fear. The jury reasonably could have found, however, that Cabrera instilled fear in Montoya, compelling him to pay. Montoya testified that he was immediately fearful and suspicious of the situation, but Cabrera would not let him talk to Garcia nor would Cabrera agree to let Montoya pick up Garcia elsewhere. Montoya was so fearful that he did not give Cabrera an accurate address. The evidence supports the jury's conclusion that Montoya paid the money out of fear for his safety and the safety of his family and, further, the evidence supports the inference that Cabrera knowingly created that fear based on his statements and actions which compelled Montoya to pay.

Accordingly, Cabrera's motion directed to his conviction on Count Fourteen is **denied**.

### 2. *Conspiracy*

All three defendants were also convicted of conspiracy to commit kidnapping (Count One) and conspiracy to commit Hobbs Act extortion (Count Two). In order to convict a defendant of criminal conspiracy, "the Government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent." *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010). "The gist of a conspiracy is an agreement between two or more participants to achieve a particular illegal end." *United States v. Santos*, 541 F.3d 63, 71 (2d Cir. 2008). "The Government's proof of an agreement does not

require evidence of a formal or express agreement; it is enough that the parties have a tacit understanding to carry out the prohibited conduct." *United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir. 1989) (internal quotation marks omitted).

The evidence must permit a rational jury to find the following beyond a reasonable doubt: "(1) the existence of the conspiracy charged; (2) that the defendant had knowledge of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." *Santos*, 541 F.3d at 70 (internal citations omitted). "When a defendant challenges the sufficiency of the evidence in a conspiracy case, 'deference to the jury's findings is especially important … because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *Id.* (citing *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004)). "Once the existence of a conspiracy has been established, the government must prove that the person charged knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *Santos*, 541 F.3d at 71 (internal quotation marks omitted). The government must prove that the defendant had knowledge of the conspiracy charged, and intended to join it. *Id.*

With any sufficiency-of-the-evidence claim, the court must view the evidence "not in isolation but in conjunction." *Casamento*, 887 F.2d at 1156. "Viewing the evidence in conjunction is especially important in a conspiracy case … where so much of the evidence is not incriminating on its face and the jury, to infer the existence of a conspiracy, must piece together circumstantial evidence." *Id.*

Here, there was ample evidence that the charged kidnapping and extortion conspiracies existed and that each of the defendants knowingly joined the conspiracies. It was clear from the testimony of the victims that the defendants were all working together to effectuate the

kidnappings and extortions of the various victims. The victims testified that usually one

defendant (Betancourt, Cabrera, or Rodriguez) approached them in Port Authority and brought

them to another defendant (Cabrera or Hernandez) who posed as the taxi driver. *See* Tr. 2/27/18,

Doc. No. 210 at 84 (Betancourt bringing Irma and her children to Hernandez's car); Tr. 2/28/18,

Doc. No. 211 at 394 (Rodriguez bringing Gutierrez and her son to Cabrera's car); Tr. 3/5/18,

Doc. No. 215 at 821-22 (Betancourt bringing Gregorio and her son to Hernandez's car); Tr.

3/6/18, Doc. No. 217 at 1058 (Betancourt bringing Santiago to Cabrera's car). Many times, the

first defendant would then also get in the car with the driver, and one of the two defendants, in

the other's presence, called the victim's family to tell them their family member was lost and/or

to discuss the "taxi fare." *See* Tr. 2/27/18, Doc. No. 210 at 84 (Betancourt getting in the car with

Hernandez, Irma, and Irma's children); Tr. 3/5/18, Doc. No. 215 at 821-22 (Betancourt getting in

the car with Hernandez, Gregorio, and Gregorio's son); *id*. at 875-77 (Betancourt calling

Velazquez while in the car with Hernandez to say Gregorio missed her bus); *id*. at 880

(Hernandez calling Velazquez while in the car with Betancourt to discuss taxi fare). There was

also testimony that when the purported taxi driver dropped off the victim and demanded

payment, they would call the "boss," Betancourt, and have the victim tell him they had paid the

money. *See* Tr. 2/28/18, Doc. No. 211 at 251-52 (Hernandez having Dilcia call Betancourt to

tell him she paid); Tr. 3/5/18, Doc. No. 215 at 889 (Hernandez having Velazquez call Betancourt

to tell him she had paid).

The government also alleged in the Third Superseding Indictment a number of overt acts

with respect to the conspiracy counts, most of which corresponded to a separate count for which

the defendants were charged with kidnapping and/or extortion. *See* Third Super. Indict., Doc.

No. 115 at 5-9. There was one additional instance that was not charged as a separate count, in

which the government alleged that Betancourt approached Idalia Sarahi Mazariegos ("Idalia") and her eleven-year-old niece at the Port Authority, took her bus tickets, and told her that there were no more buses to Connecticut. *Id*. at 5-6; *see also* Tr. 3/2/18 at 669-70. Similar to the other testimony, Idalia testified that Betancourt told her Cabrera would take them to her sister in Connecticut, and they all got in Cabrera's car, including Betancourt. Tr. 3/2/18 at 681-83. Idalia's sister, Rosaura Mazariegos ("Rosaura"), testified that she was called multiple times by two different men who were in the car with Idalia. Tr. 3/5/18, Doc. No. 214 at 776-78. The men told Rosaura that Idalia was lost in Utica, New York and could not stay there and they would bring her by taxi and charge Rosaura the fare. *Id*. at 776-77. Although not explicitly stated, it seems a fair inference that Cabrera and Betancourt were together at the time of the calls. Further, Rosaura testified that both Betancourt and Cabrera were at the meeting place when she arrived and discussed cab fare with her. *Id*. at 780. Rosaura paid them $750 after they calculated the miles from Utica. *Id*.

Further, the government introduced text messages between the defendants in which they set up the scheme to take the victims in the "taxi" and then demand hefty payments from family members. *See, e.g.,* Gov. Ex. 58B. In one text message exchange between Rodriguez and Cabrera, Rodriguez said he told someone they were being taken in a taxi, and then told Cabrera "you're a taxi … you don't know me … erase my message … and don't give my number to anyone … you don't know me." Gov. Ex. 58B at 5. Cabrera responded "Ok." *Id*. The record further reflected a text exchange in which Betancourt told Cabrera "I'm going to tell him/her I was in Buffalo, and I found him lost. Tell him/her whatever you think. Good luck." *Id*. at 2. Another time, Betancourt texted Cabrera: "he speaks English. Don't take him through Pennsylvania." *Id*. at 2. In another text message exchange, Betancourt sent someone named

Calba the following message: "You have to get him/it out of the city so that if the brother calls you, you tell him that his call didn't come through because where you're coming from it's all mountains. Call me so I can explain it to you. You received it at 9 until 2 it's 5." *Id*. at 1. Those text messages support the victims' testimony and the government's theory that the defendants were working together when picking people up from Port Authority and charging their families inflated "taxi fares."

Viewing the evidence in its totality, and in the light most favorable to the government, a rational jury could have found beyond a reasonable doubt that the defendants were knowing participants in a conspiracy to commit kidnapping and extortion. The testimony of the victims that the defendants were together throughout the process or communicated with each other and the text messages between the defendants about the different plans provides support for the conclusion that two conspiracies existed: one to take, hold, and transport the kidnapping victims, and the other to charge the extortion victims with inflated and falsified fares. Further, the testimony and text messages show that the defendants had knowledge, at one point or another, of the existence of the two plans and intentionally joined in the schemes. The jury was free to credit the victims' testimony, and I must defer to its credibility determinations. This is not a situation where there are "exceptional circumstances" that allow me to intrude upon the jury's role. *Sanchez*, 969 F.2d at 1413. Accordingly, the defendants' Motions for Judgment of Acquittal directed to their convictions on Counts One and Two are **denied**.

## III.     Motions for New Trial

### A. Standard

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Rule 33 gives the trial court "broad

discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *Sanchez*, 969 F.2d at 1413. The test for determining if a new trial should be ordered remains whether "it would be a manifest injustice to let the guilty verdict stand." *Id.* (internal quotation marks omitted). In other words, in order to grant a new trial under Rule 33, the court must answer "no" to the following question: "Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?" *Id.*

B. Discussion

Each of the three defendants also argue that he is entitled to a new trial. All three defendants argue that the court failed to charge the jury regarding the defendants' fraud defense and, similarly, that the "holding" requirement of kidnapping cannot be satisfied if the holding was merely incidental to another crime. Hernandez Mem. in Supp., Doc. No. 258 at 20; Betancourt Mem. in Supp., Doc. No. 257 at 7; Cabrera Mem. in Supp., Doc. No. 256 at 17. Hernandez argues in addition that the "inconsistencies, incongruities, and implausibilities in the government's case" warrant a new trial. Hernandez Mem. in Supp., Doc. No. 258 at 18-19.

1. *Jury Instructions*

The defendants argue that I erroneously failed to charge the jury with respect to the defendants' theory that they merely committed fraud and/or larceny against the victims and, therefore, the holding element of kidnapping was not met because the victims were merely held incidentally to the commission of another crime.

Cabrera requested the following charge with respect to the "holding" element of kidnapping:

> [W]hen the restraint or detention is found merely to have been <u>incidental</u> to the commission of some crime <u>other</u> than kidnapping, the "holding" element of the kidnapping offense is <u>not</u> proven unless the duration of the period of the victim's confinement, or degree of the victim's movement, detention, or restraint, <u>exceeded</u> that which would have been reasonably necessary for the accused to commit the <u>other</u>, non-kidnapping offense.
>
> The key determination here is (a) whether the <u>duration</u> of the confinement, or the <u>extent</u> of movement or detention of the alleged victim, was so much a part of the accused's commission of another substantive, non-kidnapping crime, that the <u>other</u> crime could not have been committed by the accused without such restrictive or confining acts; or (b) whether the duration of such confinement, or the degree of such movement, restraint, restriction or detention of the victim, was significant enough, in and of itself, to warrant independent prosecution of the accused for the offense of kidnapping. This determination is critical to your decision on the question of whether or not the government has met its burden of proof on the "holding" element of kidnapping because, under our law, there can be no kidnapping if an alleged victim's "holding" was merely, incidental to, or a necessary aspect of, a defendant's commission of some other, non-kidnapping offense.
>
> It is the defense's position that the government's evidence in this case has, at best, established that the defendants have merely engaged in a scheme to commit the misdemeanor, state law, fraud-related offenses of Larceny in the Fourth Degree and Larceny in the Fifth Degree, by False Pretenses, and that any type of restraint or detention imposed by the defendants upon any of the travelers that may have occurred in this case, was, on each occasion alleged in the indictment, merely "incidental" to the effectuation of an over-arching scheme on defendant's part to commit one of those two state larceny, or fraud-type, offenses on each of the occasions, depending on the amount of money involved in each transaction.

Cabrera Proposed Jury Instructions, Doc. No. 200 at 6-7 (emphasis in original). Cabrera then requested that the jury be charged on the law of Larceny in the Fourth and Fifth Degree, pursuant to Conn. Gen. Stat. §§ 53a-119, 53a-125, and 53a-125a. *Id*. at 7-8. Cabrera's requested charge concluded as follows:

> If … you conclude that any restraint, restriction, confinement or detention imposed by the accused upon each traveler in this case was merely incidental to, and thus necessary for the accused's commission of, a separate and distinct, non-kidnapping crime—more specifically, a scheme to commit the state law crime of larceny in the fourth or fifth degree by false pretenses—then you must find that the government failed to prove the "holding" element of the offense of kidnapping, and you must find the defendant not guilty of that offense.

*Id*. at 9-10.

Similarly, Betancourt requested this charge regarding the duration of detention for kidnapping:

> To establish the intent required for abduction, the [government] must prove that the defendant intended to prevent the complainant's liberation for a longer time or to a greater degree than that which is necessary to commit another offense, here, extortion. In this regard, the defendant's intent to prevent the complainant's liberation may be manifested by confinement or movement that is more than merely incidental to the other offense. In other words, if the confinement or movement is so much a part of the other offense that it could not have been committed without such acts, then the requisite intent to prevent the complainant's liberation has not been established. There is, however, no minimal period of confinement or degree of movement necessary to establish kidnapping.
>
> Whether the movement or confinement of the complainant is merely incidental to another offense is a question of fact for you to determine. In determining whether the defendant intended to prevent the complainant's liberation beyond the necessary degree to commit the other offense, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors: the nature and duration of the complainant's movement or confinement by the defendant; whether that movement or confinement occurred during the commission of a separate offense; whether the restraint was inherent in the nature of the separate offense; whether the restraint prevented the complainant from summoning assistance; whether the restraint reduced the defendant's risk of detection; and, whether the restraint created a significant danger or increased risk of harm independent of that posed by the separate offense.

Betancourt Request to Charge, Doc. No. 164 at 3-4.

At the charge conference, counsel for Betancourt, Attorney Christopher Duby, asked that I include a charge on fraud, 18 U.S.C. § 1341[29], even though it was not charged in the indictment. Tr. Charge Conf., Doc. No. 269 at 5. He requested that I include it as a rebuttal to the section "Negligence of Victim is Not a Defense", which provided:

> Criminal laws are designed to protect all victims, regardless of the care that they have exercised in their affairs. Thus, if you find that there was a material misrepresentation, it does not matter whether the intended victims were gullible or sophisticated, because criminal laws protect the gullible and sophisticated alike.
>
> I am instructing you that any negligence on the part of the alleged victims failing to discover a fraudulent scheme is not a defense to criminal conduct by a defendant.

---

[29] Section 1341, titled "Frauds and swindles" provides, in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" shall be fined or imprisoned.

Therefore, the question whether an alleged victim was negligent in taking or not taking steps to prevent or lessen its loss or was otherwise careless or even foolish must play no role in your deliberations.

Final Jury Instructions at 41-42. The following colloquy occurred with counsel for Betancourt:

| | |
|---|---|
| Counsel: | I think if the intention of including [that charge] was because of the fraudulent [feel] that inveiglement has, then I think that we're in a position of asking the Court to instruct on [section] 1341 by itself because I think if this is the way we're reading it – |
| The Court: | I'm not sure what you mean by that. You want me to charge – |
| Counsel: | On a fraud. |
| | … |
| The Court: | An offense that's not in the indictment? |
| Counsel: | Yes. |
| The Court: | Well, I can't do that. |
| Counsel: | I think in light of this instruction, a fraud offense becomes a lesser included [offense] of the kidnapping. Because if inveiglement is a deceit, is a fraud, is a misrepresentation – a swindle is the headline that [section] 1341 calls it -- it becomes a lesser included offense in this instance because [the government] can't prove the kidnapping absent inveiglement. And if the inveiglement is the misrepresentation, it's a fraud. We should be able to have an instruction indicating that fraud is also what's at issue here. So there's no reason why it wouldn't be a lesser included offense that we would be able to get an instruction on. |

Tr. Charge Conf., Doc. No. 269 at 5-6. The government objected to including the proposed charge, and counsel for Betancourt conceded that he did not have any authority to support his contention that fraud is a lesser-included offense of kidnapping. *Id*. at 6.

There was further colloquy on the relevance of the negligence charge, and I said it was an appropriate charge because defense counsel spent a lot of time on cross examination of each witness discussing what they could have done but did not, *i.e.,* asked someone else for help, gone to the information booth, etc. *Id*. at 6-8. Defense counsel continued to object on the basis that their questioning on cross-examination was meant to undercut the victims' credibility. *Id*. I then said that "the jury should understand that it's not up to the victim to avoid the problem if the problem is one of trickery" and that fraud "doesn't feel like a lesser include offense" to

kidnapping.  *Id.* at 9.  Defense counsel then also argued that fraud is a lesser-included offense of extortion because extortion is "basically … a larceny by coercion … [or] false pretenses", to which the government objected.  *Id.* at 9-10.  Again, I stated that fraud was not a lesser-included offense of extortion and declined to instruct the jury that it was.  *Id.* at 10.

Further, counsel for Cabrera, Attorney Gary Mastronardi,[30] argued that the defendants' theory of the case was that they defrauded the victims:

> [O]ur defense is … [the defendants] tricked [the victims] into getting into the car … by convincing them there was no bus. And then they would trick [the victims] into believing that they needed to take a cab.  Then they would trick the [victims'] family into believing [the victim] had missed their bus.  And then they would trick the family into believing that they drove from Buffalo.
> …
> This was a fraud. This was not a kidnapping. That's our whole claim here…. I think that the charge that I requested on holding, that really all of the stuff that the government claims constitutes a kidnapping is really nothing but things that are incidental to the commission of a fraud here … it's our defense.  Essentially, I was asking for a charge on our defense in this case….  This is what we told the jury from the very beginning: We tricked them into the car, we tricked them into believing, and then we charged higher fares than we should have charged.

*Id.* at 13.

I told defense counsel they were entitled to argue their defense to the jury and the following colloquy occurred with counsel for Cabrera:

| | |
|---|---|
| Counsel: | [We are] entitled to the Court giving the jury instruction that if they find that all of the things the government claims constitute kidnapping are really nothing more than conduct that's incidental to an overarching scheme to defraud and not to commit kidnapping, that the jury should acquit. That's – |
| The Court: | But that's in there.  [The government has] to prove all the elements of kidnapping, which if they don't prove any of them, you win. So, I mean, I don't understand how the charge is not doing what you want it to do. You can stand up there and say: "We're guilty of fraud. Therefore, acquit us. Because we didn't hold them, we didn't demand, we didn't use force" – |
| Counsel: | The Court is not telling them that. The Court is not telling them what fraud is, first of all…. [The jury doesn't] know what fraud is…. |

[30] After trial, Attorney Mastronardi moved to withdraw from the case and subsequent counsel, Attorney Thomas Furniss, was appointed.

|  |  |
|---|---|
| | … |
| Counsel: | The government can get up and say … "That's not a fraud. This is a fraud." |
| The Court: | No, but they'll be fighting about a case that hasn't been brought. |
| | ... |
| The Court: | All you have to do is get up and say, ["]We may have committed fraud, a charge not brought against our clients. But if it's fraud, it doesn't meet this element, that element, and the other element of kidnapping or extortion.["] |
| | … |
| The Court: | I think those defenses are fully available to you without me confusing the jury about a claim or a charge that wasn't brought. And, by the way, if they decide that your clients committed fraud, that doesn't relieve the risk that they will also be convicted of kidnapping. |

*Id*. at 14-15.

Generally, "[a] jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Rowland*, 826 F.3d 100, 115 (2d Cir. 2016) (citations and internal quotations omitted). The defendants seem to be making two separate arguments: (1) the jury instructions should have included language regarding lesser-included offenses; and (2) the jury instructions should have included the defendants' theory of the case, that they merely defrauded the victims, but did not kidnap or extort them. I will address each argument.

### a. Lesser-Included Offenses

The defendants requested that I charge the jury on Larceny in the Fourth Degree and Larceny Fifth Degree by False Pretenses,[31] pursuant to Conn. Gen. Stat. §§ 53a-119, 53a-125, and 53a-125a, and fraud pursuant to 18 U.S.C. § 1341. They argue that those crimes effectively become lesser-included offenses of kidnapping by inveiglement, because of the fraudulent nature

---

[31] It is unclear from the defendants' requested charges whether they intended to argue that Larceny in the Fourth and/or Fifth Degree was a lesser-included offense of kidnapping or, rather, whether it related to their contention that holding incidental to another crime did not satisfy the element of kidnapping and, therefore, the jury must know what other crime they were committing to make such a determination. At oral argument on the motions, however, the defendants seemed to argue that state larceny and federal fraud were both arguably lesser-included crimes of section 1201 kidnapping.

of the inveiglement element. Tr. Charge Conf., Doc. No. 269 at 6 (defendants arguing "if there's a fraud involved in effecting the kidnapping, one of the elements of kidnapping becomes fraud").

"The federal rule is that a lesser included offense instruction should be given 'if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater.'" *Hopper v. Evans*, 456 U.S. 605, 611 (1982) (quoting *Keeble v. United States*, 412 U.S. 205, 208 (1973)); *see also* Fed. R. Crim. P. 31(c) (permitting a jury to return a verdict of guilty to "an offense necessarily included in the offense charged"). The Supreme Court has explained that "a court should apply an 'elements' test to determine whether a lesser-included-offense instruction is proper under Rule 31(c)." *United States v. Diaz*, 176 F.3d 52, 100-01 (2d Cir. 1999) (quoting *Schmuck v. United States*, 489 U.S. 705, 716 (1989)). "Under this test, a defendant is entitled to a lesser-included offense instruction under federal law only if (1) the elements of the lesser offense are a subset of the elements of the charged offense … and (2) the evidence at trial permits a rational jury to find the defendant guilty of the lesser offense and acquit him of the greater." *Id*. at 101 (internal citations omitted); *see also United States v. Pedroza*, 750 F.2d 187, 204 (2d Cir. 1984) ("For an uncharged lesser offense to be 'included,' all of its elements must also be elements of the offense charged."). "[W]here the lesser offense requires an element not required for the greater offense, no instruction is to be given under Rule 31(c)." *Diaz*, 176 F.3d at 101 (internal quotation marks omitted).

i. Fraud

The defendants argue that they were entitled to an instruction on fraud pursuant to 18 U.S.C. § 1341 as a lesser-included offense of kidnapping by inveiglement because "if there's a fraud involved in effecting the kidnapping, one of the elements of kidnapping becomes fraud." Tr. Charge Conf., Doc. No. 269 at 6.

41

The elements of fraud pursuant to section 1341 are: (1) a scheme to defraud; (2) money or property as the object of the scheme; and (3) use of false or fraudulent pretenses, representations, or promises to further the scheme. 18 U.S.C. § 1341; *see also United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (explaining elements of mail and wire fraud pursuant to the same statute). As mentioned, the elements of kidnapping are: (1) taking; (2) holding; and (3) interstate nexus. *Corbett*, 750 F.3d at 251. None of the elements of fraud, therefore, are also found in kidnapping, meaning that it cannot be considered a lesser-included offense. The defendants argue that fraud becomes an element when kidnapping is committed via inveiglement. Inveiglement, however, is merely one way of proving the taking element, it does not itself become an element. Even if fraud did somehow become an element of kidnapping, the second element of section 1341 fraud, money or property as the object of the scheme, is not found within the elements of kidnapping, which requires the taking, holding, and transportation of a *person*. The defendants have not provided any authority for the proposition that fraud is a lesser-included offense of kidnapping. Indeed, there does not seem to be any lesser-included offense to section 1201 kidnapping at all. "Where no lesser included offense exists, a lesser included offense instruction detracts from, rather than enhances, the rationality of the process." *Hopkins v. Reeves*, 524 U.S. 88, 99 (1998) (internal quotation marks omitted).

At the charge conference, the defendants also seemed to suggest that section 1341 fraud can also be a lesser-included offense of the extortion counts. The Hobbs Act defines extortion, however, as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear[.]" 18 U.S.C. § 1951(b)(2). Fraud requires the taking of property or money via the use of fraudulent means, whereas extortion requires the taking of property via the use of forceful and/or fearful means. Accordingly, the elements of

fraud are not found within the elements of extortion, and fraud cannot be considered a lesser-included offense.

Just as the Second Circuit did in *Pedroza*, I "decline [the] defendants' invitation to fashion a new rule giving a defendant the option of having the jury charged on a lesser offense that is not included within the offense charged in the indictment." 750 F.2d at 204. "Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion; a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution[.]" *Id.* (internal citations and quotation marks omitted). Accordingly, the defendants were not entitled to a lesser-included offense charge on section 1341 fraud.

### ii. State Larceny Crimes

The defendants argue that the were entitled to an instruction on Larceny in the Fourth and Fifth Degrees by False Pretenses, pursuant to Conn. Gen. Stat. §§ 53a-119, 53a-125, and 53a-125a. With respect to those offenses, it does not appear that a state law crime can serve as a lesser-included offense of a federal crime that was not charged under state law. *See United States v. Petrucelli*, 97 F. App'x 355, 360 (2d Cir. 2004)[32]; *see also United States v. Castellano*, 610 F. Supp. 1359, 1414 (S.D.N.Y. 1985) (defendant charged with federal racketeering not entitled to lesser-included state crime because "different sovereigns [were] involved").

---

[32] In *Petrucelli*, the defendant was charged with, and convicted of, murder in aid of racketeering. 97 F. App'x at 356. He sought a new trial on the grounds that the jury should have been allowed to consider a lesser-included offense of manslaughter "because the predicate murder offense was charged under state law." *Id.* at 360. He further argued that manslaughter would have been a lesser-included offense if he had been tried for murder in New York state court." *Id.* The court held that murder in aid of racketeering was "'not simply a federalized version of the state crime'" of murder and, therefore, the defendant was not entitled to the lesser-included instruction. *Id.* (quoting *Diaz*, 176 F.3d at 101).

That conclusion makes sense given the rationale behind lesser-included offenses, and the distinctions between state and federal courts. As mentioned, in order for a defendant to be entitled to a lesser-included offense charge, the jury must necessarily be able to find him guilty of that offense. *See Hopper*, 456 U.S. at 611; *Keeble*, 412 U.S. at 208; Fed. R. Crim. P. 31(c). Federal and state courts are separate entities, each entitled to its own jurisdiction to adjudicate its own criminal laws. *United States v. Davis*, 906 F.2d 829, 832 (2d Cir. 1990) ("The states and the national government are distinct political communities, drawing their separate sovereign power from different sources, each from the organic law that established it. Each has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses. When a single act violates the laws of two sovereigns, the wrongdoer has committed two distinct offenses." (citing *United States v. Wheeler*, 435 U.S. 313, 316-20 (1978)). "Because the two prosecutions are independent, one sovereign should not be bound by the evidence or the strategy of the other." *Id.* (internal citations and quotation marks omitted). Accordingly, the federal courts have no jurisdiction to charge defendants with a state crime and, therefore, a federal jury has no authority to render a verdict on that state crime.[33] The defendants were, therefore, not entitled to a lesser-included offense charge on state larceny crimes because a federal jury could not have found them guilty of the state crime of larceny.[34] *See Pedroza*, 750 F.2d at 204 (declining to give lesser-included instruction on uncharged crime

---

[33] That conclusion is further supported by looking to one of the tenets of criminal law, the Double Jeopardy Clause, which "does not prevent successive prosecutions of an individual for the same act by two different sovereigns." *United States v. Medley*, 336 F. App'x 12, 14 (2d Cir. 2010) (citing *Heath v. Alabama*, 474 U.S. 82, 88 (1985)). That principle reflects the standard that federal and state entities are distinct and, therefore, are not bound by each other.

[34] Even if state crimes could otherwise serve as lesser-included offenses to federal crimes, the elements of larceny are not included within the elements of either kidnapping or extortion. *See* Conn. Gen. Stat. § 53a-119(1) (larceny by false pretenses has element of "property" which disqualifies it from being a lesser-included offense of kidnapping, and element of "fraud" which disqualifies it from being a lesser-included offense of extortion); *see also* Conn. Gen. Stat. § 53a-125 (Larceny in the Fourth Degree); Conn. Gen. Stat. § 53a-125a (Larceny in the Fifth Degree).

and stating that a defendant does not have the right to elect with which "*federal* crime" he is charged (emphasis added)).

    b.   Theory of the Case

The defendants also argue that I erred in failing to provide the jury with instructions regarding the theory of the defense case: that the defendants were merely defrauding the victims by tricking them into thinking they needed a taxi and then inflating the cab fare. The defendants requested that the jury be instructed on their theory, that "really all of the stuff that the government claims constitutes a kidnapping is really nothing but things that are incidental to the commission of a fraud here … it's our defense." Charge Conf. Tr., Doc. No. 269 at 13; *see also id.* at 14 ("I'm entitled to the Court giving the jury instruction that if [the jury finds] that all of the things that the government claims constitute kidnapping are really nothing more than conduct that's incidental to an overarching scheme to defraud and not to commit kidnapping, that the jury should acquit.").

"[A] criminal defendant is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible that evidence may be." *United States v. LaMorte*, 950 F.2d 80, 84 (2d Cir. 1991) (citing *United States v. Durham*, 825 F.2d 716, 718-19 (2d Cir. 1987)). The charge must "indicate clearly to the jury the defendant's theory of the case and that the theory, if believed, justifies acquittal…. In short, the judge's charge must adequately apprise … the jury of the elements of the crime charged and their defense." *Id*. at 84 (internal citations and quotation marks omitted). "A conviction will not be overturned for refusal to give a requested charge, however, unless that instruction is legally correct, represents a theory of defense with basis in the record that would

lead to acquittal, and the theory is not effectively presented elsewhere in the charge." *United States v. Vazquez*, 82 F.3d 574, 575 (2d Cir. 1996).

The defendants argued generally that the government could not prove that they took and/or held the victims and, therefore, they could not be found guilty of kidnapping. The charge did include the substance of that defense, that the government must prove both the taking and the holding elements in order for the defendant to be found guilty. *See* Final Jury Instructions at 10 ("the government must prove each element of each crime charged beyond a reasonable doubt"); *id.* at 18 ("In order to convict any defendant of any offense, the government must prove each element of the charge beyond a reasonable doubt. Each element must be proved with respect to each Count."); *id.* at 29 ("For you to find a defendant guilty of … kidnapping, you must be convinced that the government has proven each of the following elements beyond a reasonable doubt: First, [taking] … Second, [holding] … Third, [across state lines]."); and *id.* at 42 ("If … you have a reasonable doubt about any of the elements of a particular count with respect to a particular defendant, then it is your duty to find that defendant not guilty on that count.").

The premise of the defendants' fraud defense, specifically, is that if the jury found that the holding of the victim was merely incidental to another crime, here larceny and/or fraud, then the government failed to establish the holding requirement and, therefore, had not established the defendants were guilty of kidnapping, at least for the period of time the jury found the holding was merely incidental to the other crime. Accordingly, the defendants requested that I charge the jury on fraud and/or larceny, as discussed above. It does not appear to be the law of this circuit that if the jury found that the defendants' holding of a victim was incidental to their committing larceny and/or fraud that the government has failed to prove the holding element of kidnapping. That may be true in the Eleventh Circuit (*see United States v. Howard*, 918 F.2d 1529, 1536-37

(11th Cir. 1990)), the Third Circuit (*see Government of Virgin Islands v. Berry*, 604 F.2d 221, 226-27 (3d Cir. 1970)), the Ninth Circuit (*see United States v. Etsitty*, 130 F.2d 420, 427 (9th Cir. 1997)), and under the Connecticut state kidnapping statute (*see State v. Salamon*, 287 Conn. 509 (2008)). But there is no guidance from the Second Circuit that holding incidental to another crime does not constitute holding for the purposes of proving kidnapping. As I stated at the charge conference, being guilty of another crime (here, an uncharged crime) does not necessarily negate guilt on the kidnapping and/or extortion charge.

The requested charge on the defendants' fraud defense is premised on an inaccurate statement of the law and, therefore, the defendants were not entitled to it.[35]

### 2. *Government's Case*

Hernandez also argues that the "inconsistencies, incongruities, and implausibilities in the government's case" entitles him to a new trial. Hernandez Mem. in Supp., Doc. No. 258 at 18-19. Almost all of the kidnapping and extortion victims testified that they were applying for a U nonimmigrant visa ("U-Visa") which, according to the Department of Homeland Security, is a type of United States visa given to victims of certain crimes (including kidnapping and extortion) who have suffered mental or physical abuse and are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity. A U-Visa may extend to some of the victim's immediate family members. After a U-Visa is granted, a victim can legally work and can apply for permanent residence after three years. Hernandez argues that the testimony of

---

[35] The defendants did not request at the charge conference an instruction on their fraud theory alone, separate from the additional, unfounded, "incidental holding" instruction. Regardless, even if they had, I instructed the jury on the first day of trial, in the pretrial jury instructions, regarding the defendants' theory of the case. *See* Tr. 2/27/18 at 28-30 (instructing the jury that the defendants concede that they "would often trick the [victims] into believing that they had somehow missed their bus connections to Connecticut" and then would charge the relatives "cab fares that were higher … than should have been charged" but defendants denied engaging in kidnapping or extortion). Therefore, to the extent the defendants asked, and I declined, to include their theory of the case absent the "incidental holding" instruction, the jury was on notice of the defendants' theory of the case, so there was no prejudice to the defendants.

the witnesses "demonstrated the uniquely powerful incentives of [a] U-visa and government assistance in obtaining testimony of a very specific nature against the defendant." Hernandez Mem. in Supp., Doc. No. 258 at 17.

Essentially, Hernandez argues that the victims, aided by the government, conformed their testimony to ensure they were eligible for U-Visas on the basis of being a kidnapping or extortion victim, rather than a victim of fraud or larceny. *See id.* at 17-19. Hernandez argues that this was clear from the relationship the victims had with "Jackie" (Assistant United States Attorney Jacabed Rodriguez-Coss), and from the unusual way the investigation was initiated, by a detective who was somehow connected to a coworker of Dilcia's, who "expressed *prior knowledge* that the defendants were guilty of the *violent qualifying* offenses" before interviewing the victims. *Id*. at 18 (emphasis in original). Hernandez argues that this "served to place a heavy thumb on the scales of justice, such as to skew jury determinations of credibility" and, therefore, he is entitled to a new trial. *Id*. at 19.

The defendants vigorously cross examined the victims on all those topics, most specifically their U-Visa applications and any incentive it created for the victims to testify in a certain way. The jury heard all about the U-Visa applications, the victims' relationships with various government agents, and how the investigation occurred. It is up to the jury, not the court, to determine the weight of the evidence, the credibility of the witnesses, and the competing inferences that can be drawn from the evidence. *Best*, 219 F.3d at 200. I must defer to the jury's determinations. This is not a situation in which "exceptional circumstances" have been demonstrated, and the verdict did not depend on testimony that was "patently incredible or defie[d] physical realities." *Sanchez*, 969 F.2d at 1413. Accordingly, the defendants have not

suffered a "manifest injustice," requiring a new trial.  Their motions for a new trial are, therefore, **denied.**

**IV.     Conclusion**

For the foregoing reasons, the defendants' Motions for Judgment of Acquittal and/or New Trial (Doc. No. 234, 235, 242, 257) are **denied**.

So ordered.

Dated at Bridgeport, Connecticut, this 28th day of June 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
